BUSINESS AND PROFESSIONAL PEOPLE FOR THE PUBLIC INTER-
EST *et al.*, Petitioners, v. THE ILLINOIS COMMERCE COMMISSION *et
al.*, Respondents.

First District (6th Division)   No. 1—89—2151

Opinion filed October 26, 1990.

Stephen J. Moore, of Chicago, for petitioner Office of Public Counsel.

Douglass W. Cassell, Jr., of Chicago, for petitioner Business and Profes-
sional People for Public Interest.

Neil F. Hartigan, Attorney General, of Springfield (Edward P. O'Brien and John P. Kelliher, Special Assistant Attorneys General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

Sidley & Austin, of Chicago (Howard J. Trienens, Michael I. Miller, Eugene H. Bernstein, David F. Graham, and Gerard D. Kelly, of counsel), for respondent Commonwealth Edison Company.

JUSTICE RAKOWSKI delivered the opinion of the court:

Petitioners Business and Professional People for the Public Interest and People of the State of Illinois *ex rel.* Office of Public Counsel appeal a decision by the Illinois Commerce Commission (ICC or Commission) granting Commonwealth Edison Company (Edison) permission to adjust accounting procedures on financing costs and defer depreciation at its Braidwood Unit 2 nuclear power plant (Braidwood Unit 2) until Edison receives a rate increase reflecting the costs of the Braidwood facility. This court has jurisdiction under the Public Utilities Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201) and Supreme Court Rule 335 (107 Ill. 2d R. 335).

The issues presented by the appellants' initial brief were: (1) whether the ICC committed error when it allowed Edison to use the accounting procedures for a plant under construction during the time after Braidwood Unit 2 had gone into service but before ICC granted a rate change reflecting the plant's placement in the Edison rate base; and (2) whether the ICC decision to approve favorable accounting treatment for Braidwood Unit 2 was arbitrary and capricious, not supported by substantial evidence and lacked sufficient findings and analysis to allow informed judicial review. We affirm.

Braidwood Unit 2 began generating electricity on March 25, 1988, and was placed in service for accounting purposes on August 5, 1988. Pursuant to the rules of accounting for a new utility property, Edison changed its accounting procedures for Braidwood on that date. Prior to that date, during the construction of the plant, Edison accumulated its costs in capital accounts (capitalized costs) and accrued interest on these amounts in AFUDC (allowance for funds used during construction). The costs included direct building costs for labor and material plus the carrying or financing costs of interest paid on debt and foregone return on equity capital. Once Braidwood Unit 2 was completed and placed in service, Edison changed its accounting in two ways: it stopped recording the carrying costs in AFUDC and it began charging depreciation on the physical plant. See Uniform System of Accounts for Electric Utilities, 83 Ill. Adm. Code §415 (1985).

This change in accounting procedures results in a loss of recorded earnings. Normally, a utility compensates by changing its rate charges to permit recovery of reasonable costs invested in the plant. Ideally, the utility should synchronize any accounting changes and corresponding rate changes so that the loss of earnings through depreciation is balanced with a gain in earnings through new rate charges. In fact, the ICC "has recognized that there can be circumstances where it is important to synchronize as nearly as practicable the placing in service of new generating facilities and the related rate changes." (ICC Docket No. 85—0092, Order on Rehearing at 3; also in *Re Commonwealth Edison Co.* (Ill. Com. Comm'n Oct. 3, 1985), 70 Pub. Util. Rep. 107 (PUR 4th).) In order to synchronize these changes at Braidwood Unit 2, Edison applied to the ICC for a rate change on August 21, 1987, almost a year before the in-service date of the new plant. That rate change has not yet been granted and all parties concede that Edison is not culpable for the delay.

On August 15, 1988, Edison filed a request for permission to defer depreciation and record finance or carrying costs until after the date of a rate order for Braidwood Unit 2. At the hearing, Edison presented evidence to show that, without the accounting change, the introduction of Braidwood Unit 2 would result in an annual loss of earnings of $1.20 per share or $240 million. This loss threatened to drop the utility's return per share below the dividend level of $3, which it had maintained for more than seven years. In an order entered on June 1, 1989, the ICC granted Edison's request for this favorable accounting treatment:

"Edison will be allowed to record carrying charges and deferred depreciation expenses for Braidwood Unit 2 until rates reflecting the allowable costs of the unit are determined and become effective. The Commission does not here make any determination as to costs associated with Braidwood Unit 2 that are properly included in Edison's rate base or rates. The determination that the accounting treatment approved herein is appropriate rests on the Commission's view of the propriety of allowing Edison an opportunity to recover its carrying costs and depreciation expense. Consideration of whether such costs are reasonable and proper and the recovery of such costs consistent with revenue limitations provided in the Sixth Interim Order entered on December 30, 1988, should be resolved in the proceedings of the consolidated dockets identified herein." ICC Docket No. 88—0253, Order at 18; also in *Re Commonwealth Edison Co.* (Ill. Com. Comm'n June 1, 1989), 103 Pub. Util.

Rep. 80, 88 (PUR 4th).

"IT IS THEREFORE ORDERED THAT Commonwealth Edison Company be, and is hereby, authorized to record and capitalize carrying charges and deferred depreciation expense on Braidwood Unit 2 in accordance with Findings 9 and 10 herein until such time as a determination as to the reasonable and proper investment in said Unit has been made by the Commission for inclusion in Edison's rates." ICC Docket No. 88—0253, Order at 20.

■ Under the Illinois Public Utilities Act (Act), when appellants appeal an ICC decision:

"The findings and conclusions of the Commission [ICC] on questions of fact shall be held prima facie to be true and as found by the Commission; rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(d).)

(See also *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1987), 153 Ill. App. 3d 28, 31, 504 N.E.2d 1367.) However, the court shall reverse a Commission decision if it finds that the decision was: (1) "not supported by substantial evidence based on the entire record of evidence" before the ICC; (2) outside the jurisdiction of the ICC; (3) in violation of the State or Federal constitution or laws; or (4) reached through procedures which "were in violation of the State or federal constitution or laws, to the prejudice of the appellant." Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(D); see also *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 204, 555 N.E.2d 693.

I

In their initial brief the appellants claimed that the ICC acted beyond its authority and engaged in single-issue and retroactive rate-making when it granted Edison permission to defer depreciation and to accrue financing costs on Braidwood Unit 2 from the time the plant entered service until the date of a rate change which would take the costs and capacities of Braidwood Unit 2 into account for calculating the new rate. At oral argument, defendants maintained that the change in accounting procedures merely preserved the possibility that the costs accrued could be included in the rates eventually set to include Braidwood Unit 2 as an in-service plant. Appellants were willing

to concede that a change in accounting procedures was not a form of ratemaking if and only if the eventual ratemaking hearing considered the full range of elements that make up Edison's cost structure and did not presume that any costs accrued during the special accounting period would necessarily be included in the final rates.

In fact, the ICC's order allowing Edison to record post-construction carrying costs specified that "[c]onsideration of whether such costs are reasonable and proper and the recovery of such costs consistent with revenue limitations *** shall be resolved in" future rate proceedings. The order authorized Edison "to record and capitalize carrying charges and deferred depreciation expense on Braidwood Unit 2 *** until such time as a determination as to the reasonable and proper investment in said Unit has been made by the Commission for inclusion in Edison's rates."

In short, the parties agree that the ICC order was not ratemaking. Ordinarily this would dispose of the issues of single-issue and retroactive ratemaking. However, the problem remains whether the ICC can ever use the record of costs kept in the special accounts when it sets future rates. If these special accounts cannot have any effect on future rates, then the ICC has ordered Edison to perform a useless act and thus executed an arbitrary and capricious order. But, plaintiffs argue, if the information in the record can have an effect in setting future rates, then the ICC may have set up the record for retroactive ratemaking. This is the problem we address here, whether setting up accounting procedures to recover post-construction costs and then using the information to set future rates is, in effect, a form of retroactive ratemaking.

■ When it sets rates, the ICC's action is "legislative in character and prospective in its operation." (*Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.* (1954), 2 Ill. 2d 205, 210, 117 N.E.2d 774.) Consequently, once the ICC sets rates, there can be no retroactive adjustments even if a court later finds the rates unreasonable (*Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 510 N.E.2d 850) or the ICC reduces the tax depreciation expenses for the utility (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 529 N.E.2d 510). In effect, the rule against retroactive ratemaking prohibits "refunds when rates are too high and surcharges when rates are too low." *Business & Professional People*, 136 Ill. 2d at 209.

■ In this case, the ICC decision allowed Edison to recompute financing costs for an in-service plant dating back to August 5, 1988. If rates had already been set taking Braidwood Unit 2 into account,

then any readjustment of rates based on this new calculation of costs would be retroactive ratemaking under the authorities just cited. But such is not the situation here.

Appellants cite *Kentucky Utilities Co. v. Federal Energy Regulatory Comm'n* (D.C. Cir. 1985), 760 F.2d 1321, for the proposition that "in circumstances such as the one before this court, regulatory principles prohibit the retroactive recovery of post construction capital costs." That case is distinguishable on several grounds, the most important of which are statutory scheme and utility fault. *Kentucky Utilities* was an appeal from the Federal Energy Regulatory Commission and specifically acknowledged that practices varied under various State laws and commissions. Furthermore, the Kentucky utility had caused the delay in ratemaking. By contrast, Edison was not at fault for the time lag between when Braidwood Unit 2 went into service and new rates will come into effect. See *Kentucky Utilities*, 760 F.2d at 1324-26.

The ICC order of June 1, 1989, was an order to affect accounting procedures, not a ratemaking decision. As such, that order does not foreclose any discussion or presentation of evidence that would normally occur when ICC conducts the ratemaking hearing for Braidwood Unit 2. Nor does the order constitute a backdoor approach to single-issue or retroactive ratemaking.

For these reasons, we hold that the ICC did have authority to issue the order of June 1, 1989.

II

Appellants also claim that the ICC decision to approve favorable accounting treatment for Braidwood Unit 2 was an arbitrary and capricious misapplication of its own standards, unsupported by substantial evidence, and without sufficient findings and evidence to allow informed judicial review. See Ill. Rev. Stat. 1989, ch. 111⅔, pars. 10—201(e)(ii), (e)(iii), (e)(iv)(A).

In its order for this case, entered June 1, 1989, the ICC quoted the following statement from docket No. 85—0092 both in its order entered on May 15, 1985, and the order on rehearing entered on October 3, 1985:

"The Commission has recognized that there can be circumstances where it is important to synchronize as nearly as practicable the placing in service of new generating facilities and the related rate changes. During the period after the recording of AFUDC has ceased and before cash recovery through rates of these capitalized costs begins, there is no recognition of the

Company's carrying costs associated with the property. *When the construction project involved is large and the regulatory lag is significant, the impact on the utility, its costs of capital, and its shareholders can be serious. Here, with regard to Byron Unit 1, circumstances beyond the control of Edison or the Commission created a significant lag between the in-service date of Byron Unit 1 and the associated rate adjustment.* [(Emphasis added by the ICC in this case.)] [After t]he Commission granted Edison the authority to depart from normal accounting practices, by recording AFUDC and postponing commencement of depreciation until Byron Unit 1 is reflected in rates, the Company did not lose its ability to recover costs incurred during this lag. The Commission concludes that it is appropriate and in the interest of Edison and its ratepayers to recognize the economic realities of the situation by allowing this departure from normal accounting practices." (ICC Docket No. 88—0253, Order at 15.)

The ICC also quoted finding 5 from the earlier orders:

"(5) if this normal accounting practice is followed, and if, as is anticipated, there is a lag between the in-service date and the date on which Byron Unit 1 is reflected in Petitioner's base rates, Petitioner's earnings *could be* adversely affected, as well as its short-term and long-term cost of capital." (Emphasis added by the ICC in this case.) ICC Docket No. 88—0253, Order at 3.

Appellants now argue that the ICC departed from the two-prong test established in docket No. 85—0092. The test requires:

"1. Circumstances beyond the control of the utility or the Commission which create a significant lag between the in-service date of the unit and the associated rate adjustment.

2. Circumstances which result in a serious financial impact on the utility, its cost of capital and its shareholders." ICC Docket No. 88—0253, Order dissent at 1, citing ICC Docket No. 85—0092, Order.

■ Appellants do not argue that Edison was in any way at fault for the delay in setting proper rates for Braidwood Unit 2. Thus, for the purposes of review here, Edison met the first prong of the two-part test.

But appellants assert that Edison received its interim accounting treatment without establishing the second prong of "serious" impact on Edison and its shareholders. Edison did present evidence to project an annual loss in earnings of $1.20 per share for a total of $240

million. Appellants claim, however, that "Edison merely showed the obvious: its earnings would be less if the Commission denied the requested accounting change."

Edison argues that it only had to prove that the impact of accounting practices "can be serious" and earnings "could be" affected by accounting practices. (ICC Docket No. 85—0092, Order on Rehearing at 3, 8.) Edison argues that it did demonstrate a drop in earnings of "approximately one-third" and did not need to present evidence of all possible consequences under different accounting scenarios.

Thus, no one in this case disputes that Edison suffered some regulatory delay through no fault of its own and showed some actual or possible harm under the normal accounting practices. Under the standard set in docket No. 85—0092, this is sufficient. The fact that one element is obvious or nearly always present does not obviate or dispose of a two-prong test.

For these reasons, we hold that the ICC used sufficient evidence and applied its own standards in a reasonable way when it entered the order of June 1, 1989.

The judgment of the Illinois Commerce Commission is affirmed.

Judgment affirmed.

LaPORTA, P.J., and EGAN, J., concur.