(Nos. 68100, 68246, 68247, 68306, 68355 cons.—Reversed

BUSINESS AND PROFESSIONAL PEOPLE FOR THE PUBLIC INTEREST *et al.*, Appellants, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

*Opinion filed December 21, 1989.—Modified on denial*
*of rehearing May 31, 1990.*

Douglass W. Cassel, Jr., and Howard A. Learner, of Chicago, for appellant Business and Professional People for the Public Interest.

Jenner & Block, of Chicago (Robert L. Graham, Laura A. Kaster and Norman M. Hirsch, of counsel), for appellant Citizens Utility Board.

Richard M. Daley and Cecil A. Partee, State's Attorneys, of Chicago (Thomas H. Rowland and Winifred A. Watts, Assistant State's Attorneys, of counsel), and Patrick N. Giordano, of Foley & Lardner, of Chicago, for appellants People of Cook County.

Allen W. Cherry, of Chicago, for appellants Low Income Residential Consumers.

John P. Meyer, of Danville, for appellant Illinois Department of Transportation.

Judson H. Miner, Corporation Counsel, and Kelly R. Welsh, Acting Corporation Counsel, of Chicago (Ruth M. Moscovitch, Dodge Wells, Jean Dobrer and Robin Schulberg, of counsel), for appellant City of Chicago.

Stephen J. Moore, Public Counsel, and Stephen Fogel, Deputy Public Counsel, of Chicago, for the appellant Office of Public Counsel.

Clyde Kurlander, Edward P. O'Brien and John P. Kelliher, Special Assistant Attorneys General, of Chicago, for appellee Illinois Commerce Commission.

Howard J. Trienens, Michael I. Miller, David W. Carpenter, and David F. Graham, of Sidley & Austin, and Kevin M. Forde, all of Chicago, for appellee Commonwealth Edison Co.

Randall Robertson, Eric Robertson and Edward C. Fitzhenry, of Lueders, Robertson & Konzen, of Granite City, for appellee Illinois Industrial Energy Consumers.

Leonard S. Shifflett, of Burke, Wilson & McIlvaine,

of Chicago, for *amicus curiae* Illinois Retail Merchants Association.

JUSTICE CALVO delivered the opinion of the court:

The Illinois Commerce Commission (Commission) entered a sixth interim order (Sixth Order) in these consolidated cases on December 30, 1988, granting Commonwealth Edison Company (Edison) a two-step rate increase for electric service over a five-year period. Two of the seven commissioners concurred in part and dissented in part from the Sixth Order. Several intervenors, on behalf of various ratepayers, filed motions with this court for a direct appeal pursuant to Supreme Court Rule 302(b) (107 Ill. 2d R. 302(b)), and we allowed said motions. Those intervenors filing briefs opposing various provisions of the Sixth Order include Business and Professional People for the Public Interest (BPI), Citizens Utility Board (CUB), the City of Chicago (City), the People of Cook County *ex rel.* Richard M. Daley (Cook County), Low Income Residential Consumers (LIRC), the People of the State of Illinois *ex rel.* Office of Public Counsel (State), and the Illinois Department of Transportation (IDOT). Edison, the Commission and the Illinois Industrial Energy Consumers (IIEC) filed briefs asking us to uphold the Sixth Order.

I. Proceedings Before the Commission

On August 21, 1987, pursuant to the Public Utilities Act (Act) (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 1—101 *et seq.*), Edison filed tariffs with the Commission requesting a $1.414 billion annual, 26.9%, increase in rates for electric service to cover costs associated with bringing the Byron Unit 2, Braidwood Unit 1 and Braidwood Unit 2 nuclear power plants (units) into service. The Commission suspended the proposed tariffs through July 17, 1988, pursuant to section 9—201(b) of the Act, which al-

lows the Commission to suspend tariffs for up to 11 months. Pending completion of audits of the units, as required by section 9—213 of the Act, the Commission held evidentiary hearings, beginning January 6, 1988, and extending over several months, on the nonaudit portions of the case. The auditors released the Byron Unit 2 and Braidwood Unit 1 audits in April 1988. Edison, various intervenors and the staff of the Commission (Staff) filed briefs on the nonaudit issues in May 1988. Staff recommended in early 1988 that Edison receive a rate decrease of $343 million.

On June 6, 1988, Staff filed a "Motion for the Commission to Defer the Resolution of the Rate Case and to Pursue an Alternative Resolution." Staff attached to this motion a settlement proposal. The proposal provided for a $235 million rate increase effective January 1, 1989, and a $245 million rate increase effective January 1, 1990. The proposal also provided for a rate freeze through December 31, 1993, after the second rate increase. The proposal contained numerous other provisions.

On June 8, the Commission entered its fourth interim order (Fourth Order) allowing Staff's motion over the objections of various intervenors. The Commission, however, found that because suspension of the tariffs ended on July 17, sufficient time did not exist within which to pursue a settlement. Consequently, the Commission, in its Fourth Order, stated that Edison had to withdraw and refile its tariffs if Edison wanted to pursue Staff's settlement proposal. If Edison refiled the tariffs, the Commission could again suspend the tariffs and thus provide the parties and intervenors with another 11-month period within which to pursue a settlement and conduct further proceedings. The Commission also stated that it would then consolidate the two dockets.

The Fourth Order provided further that if Edison did not agree to pursue the settlement proposal, the Commission would enter an order deciding the merits of the case by June 13, 1988. The Commission stated that if Edison agreed to pursue the proposal, the parties and intervenors would engage in negotiations until August 1, 1988. At that time, Staff could end the negotiations, if no reasonable opportunities for a resolution existed. The case would then proceed from the point at which it had stopped prior to the negotiations, and the Commission would enter a final order deciding the merits of the case by September 15, 1988. The Fourth Order also provided, however, that if Staff filed an offer of settlement (Settlement) by August 1, the Commission would establish a hearing schedule which would permit the Commission to enter a final order allowing or denying the Settlement by December 1, 1988. Under the Fourth Order, if the Commission decided to reject the Settlement, the Commission would enter a final order deciding the merits of the case by December 31, 1988.

On June 10, 1988, Edison withdrew and refiled its tariffs. Staff filed a Settlement on August 1, 1988. This Settlement contained the same provisions as the settlement proposal attached to Staff's earlier motion. In response, various intervenors moved for a decision on the merits of the case; the Commission denied the motion. Procedural hearings on the Settlement and the audits of Byron Unit 2 and Braidwood Unit 1 began on August 2. The auditors had not completed the Braidwood Unit 2 audit, and they did not release the audit until February 28, 1989, so the proceedings and the orders of the Commission did not resolve issues related to the Braidwood Unit 2 audit. The Commission held evidentiary hearings from September 19 through October 11. The parties filed briefs thereafter, and oral arguments took place on December 1 and 2, 1988.

The Commission issued a fifth interim order (Fifth Order) on December 21, 1988. The Commission attached to the Fifth Order a draft of its Sixth Order which incorporated the Settlement with some modifications. In the Fifth Order, the Commission stated it would adopt the Sixth Order, if Edison agreed to be bound by the terms and conditions in the Sixth Order. The Commission stated that Edison must agree to the Sixth Order because the Sixth Order contained certain provisions which the Commission could not legally implement unilaterally; these provisions included imposition of a rate moratorium and allowance of retroactive refunds. If Edison did not agree to the Sixth Order, the Fifth Order provided that the Commission would enter a decision on the merits of the case by May 6, 1989.

Edison submitted written acceptance of the Sixth Order, and on December 30, 1988, the Commission entered the Sixth Order. The Commission subsequently amended the Sixth Order on January 25, 1989, and again on February 8, 1989. One commissioner dissented from the latter amendment. The Commission denied the intervenors' petitions and applications for rehearing.

## II. Authority of the Commission

### A. Powers of the Commission

The main issue is whether the Commission had authority to enter the Sixth Order. The Commission only has those powers given it by the legislature through the Act. (*Union Electric Co. v. Illinois Commerce Comm'n* (1979), 77 Ill. 2d 364, 383.) Under the Act, the Commission has "general supervision of all public utilities" (Ill. Rev. Stat. 1987, ch. 111⅔, par. 4—101), including Edison. In supervising the utilities, the Commission may examine the rates and other charges of the utilities and re-

view the compliance of the utilities with the Act. Ill. Rev. Stat. 1987, ch. 111⅔, par. 4—101.

The Act gives the Commission investigative powers. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—101.) The Commission, usually through its Staff, may gather evidence, subpoena witnesses, depose witnesses, or require the production of documents in order to determine whether a utility has complied with the Act. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—106.) The Staff, or those employees of the Commission who engage in investigatory, prosecutorial, or advocacy functions, remains separate from the commissioners, hearing examiners and other members of the Commission who render decisions. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—103.) The Commission, therefore, has a special role in that it performs investigative, prosecutorial and advocacy, as well as decisionmaking, functions.

When a utility files a rate schedule, the Commission has the power, "upon complaint or upon its own initiative," to hold "a hearing concerning the propriety of such rate." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—201(b).) The Act sets forth various findings the Commission must make before the Commission may approve the proposed rates of a utility. For example, the Commission cannot include in the rate base of a utility a "new electric utility generating plant," or any "significant addition" to an existing plant, "unless and until the utility proves, and the Commission determines, that such plant *** is both prudent and used and useful in providing utility service to the utility's customers." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—212.) Moreover, the Commission cannot include the cost of new plants in the rate base of a utility until the Commission determines that such cost is "reasonable." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—213.) The Commission must also determine whether the proposed rates are "just and reasonable." (Ill. Rev. Stat.

1987, ch. 111²/₃, par. 9—101.) If the Commission finds the rates unreasonable, it must set new, reasonable rates. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—250.) If the rate hearings involve the proposed inclusion of a significant new production or generation facility in the rate base of an electric utility, "the Commission may consider the adoption of a rate moderation plan which is designed to diminish the immediate rate impact of such proposed inclusion." Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—217.

The hearing and rulemaking procedures of the Commission are governed by the Act and the Illinois Administrative Procedure Act (IAPA) (Ill. Rev. Stat. 1987, ch. 127, par. 1001 *et seq.*). (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—101.) The Act provides:

> "Any proceeding intended to lead to the establishment of policies, practices, rules or programs applicable to more than one utility may, in the Commission's discretion, be conducted pursuant to either rulemaking or contested case provisions, provided such choice is clearly indicated at the beginning of such proceeding and subsequently adhered to." (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—101.)

The Commission may "adopt reasonable and proper rules and regulations relative to the exercise of its powers, and proper rules to govern its proceedings, and regulate the mode and manner of all investigations and hearings, and alter and amend the same." (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—101.) These rules and regulations must be consistent with the Act and the IAPA. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—101.) Moreover, in all proceedings:

> "any finding, decision or order made by the Commission shall be based exclusively on the record for decision in the case, which shall include only the transcript of testimony and exhibits together with all papers and requests filed in the proceeding, including, in contested cases, the documents and information described in *** the [IAPA]." Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—103.

## B. Scope of Review

A reviewing court can only reverse, in whole or in part, a Commission rule, regulation, order or decision, if (1) the "findings of the Commission are not supported by substantial evidence," (2) the "rule, regulation, order or decision is without the jurisdiction of the Commission," (3) the rule, regulation, order or decision violates the Federal or State Constitution or laws, or (4) the manner by which the Commission decided its rule, regulation, order or decision violated the Federal or State Constitution or laws "to the prejudice of the appellant." (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(iv).)

> "Setting utility rates is a legislative rather than judicial function. [Citations.] In the ratemaking scheme, the Commission and not the court is the fact-finding body. [Citation.] Apart from examining whether the Commission acted within the scope of its authority or infringed upon a constitutional right, a court is limited to reviewing whether the Commission set out findings of fact supporting its decision and whether the findings are against the manifest weight of the evidence." (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 142.)

(See *Cerro Copper Products v. Illinois Commerce Comm'n* (1980), 83 Ill. 2d 364, 370-71; *State Public Utilities Comm'n ex rel. City of Springfield v. Springfield Gas & Electric Co.* (1919), 291 Ill. 209, 215-16.) The court's review of a Commission decision is, therefore, limited. The interpretation by the Commission of a question of law, however, is not binding upon a reviewing court. *Hartigan*, 117 Ill. 2d at 137.

## C. Provisions of the Sixth Order

The essential provisions of the Sixth Order are as follows:

(1) On January 1, 1989, a rate increase of $235 million will take effect.

(2) On January 1, 1990, a rate increase of $245 million will take effect.

(3) Edison cannot file for any further rate increases prior to February 1, 1993, except under certain circumstances set forth in the Sixth Order.

(4) Staff will review the earnings of Edison at the end of each year from 1989 through 1993. If the Commission determines Edison earned excess revenue during the year, the Commission could order a refund which would become effective the following year.

(5) Because the Braidwood Unit 2 audit was not completed, the Commission did not make any findings or determinations in the Sixth Order regarding the rate base value of that unit. The Commission will hold hearings and make findings concerning the rate base value of Braidwood Unit 2 in 1989.

(6) The findings in the Sixth Order regarding Byron Unit 2 and Braidwood Unit 1 establish minimum rate base values. The parties and intervenors may present additional evidence concerning the final rate base values of these units during the 1989 hearings.

(7) The 1989 (first-step) rate increase is reasonable.

(8) The Commission did not determine the reasonableness of the 1990 (second-step) rate increase in the Sixth Order. The Commission will make that determination after completion of the Braidwood Unit 2 audit and after further hearings in 1989.

(a) The Commission will only approve the second-step rate increase if the evidence supports such a finding.

(b) Any revenues in excess of the first-step rate increase found just and reasonable in the Sixth Order may be used to support the second-step rate increase.

(c) The $245 million is a cap on, or the maximum of, the rate increase for 1990.

(d) If the evidence demonstrates that reasonable costs are in excess of the amount necessary to support a $245 million rate increase, those costs will not be included in rates during the five-year moratorium.

(e) No carrying charges on excess revenues or on any costs excluded from rates can accrue during or after the moratorium.

(f) The Commission may, after a determination based on the evidence, include in rates after the moratorium any excess costs or revenues.

(g) If the Commission determines a rate increase less than $245 million is reasonable, Edison will have the option of withdrawing from the Sixth Order, and the Commission will have the right to consider whether a rate reduction and refund of the excess revenues from the first-step rate increase would be appropriate.

## D. Characterization of the Sixth Order

In arguments before the Commission, the intervenors contended the Commission could not consider the Settlement because not all of the parties and intervenors had agreed to the Settlement. The intervenors also asserted the Commission had no authority to adopt a unilateral offer of settlement. The Commission, however, framed and dealt with the issue of its authority to implement the Sixth Order this way:

"The Intervenors misconstrue the nature of Staff's Offer of Settlement and the standard of the Commission's review of the Offer of Settlement. Staff does not present its Offer of Settlement as a negotiated and signed settlement agreement. Staff is not offering the negotiating process as the basis for the reasonableness of the rates proposed in its Offer of Settlement. Staff did not require any. party to sign-on to the Offer of Settlement in contract fashion. Accordingly, *the Intervenors are*

*correct that the Offer of Settlement is not a settlement agreement and should not be judged by the standards for such an agreement.* Staff does not claim otherwise. The Fourth Interim Order did not specify that Staff needed to obtain a settlement agreement. It did specify that Staff could file an 'Offer of Settlement'.

*Staff presents its Offer of Settlement as a just and reasonable resolution of the issues in the subject proceedings on the merits, based on substantial evidence in the record as a whole. Staff proposes that its Offer of Settlement be reviewed pursuant to traditional just and reasonable standards and that such review be on the merits of each issue based on the record as a whole. Staff submits that the rate levels in its Offer of Settlement are justified by application of traditional ratemaking principles.*

The failure of the Act to make specific provisions for offers of settlement does not make such a procedure *ipso facto* unlawful. While there is precedent for the consideration of proposals labeled offers of settlement by regulatory agencies in the federal and other state jurisdictions, the label on the proposal is irrelevant. What is relevant is whether the Commission acts within its statutory authority and abides by the applicable statutory provisions in making its determination regarding the Offer of Settlement. The Commission has broad jurisdictional authority which it must exercise appropriately to reach a resolution. There is no question that the Commission can determine just and reasonable rates based on a lawful analysis.

The Commission remains free under the Offer of Settlement to exercise all of its powers under the Act. Its resolution does not depend on the analyses of rate ranges presented by Staff and other parties. The negotiating process and range analysis preceding Staff's Offer of Settlement are not at issue. Rather, the consideration of the Offer of Settlement depends on the relevant and material evidence relating to traditional ratemaking principles. There are settlement aspects to the Offer of Settlement in that it contains certain restrictions and requirements which have not previously been imposed on a utility and which could not be imposed on a utility without its con-

sent. Nevertheless, the Offer of Settlement must be evaluated on its merits and must be consistent with the requirements of the Act. Whether the Offer of Settlement proposes just and reasonable rates and whether its other proposals are balanced and fair will be determined by evaluating its provisions." (Emphasis added.)

Thus, the Commission held it did not treat the Settlement as a settlement agreement; rather, it judged the Settlement as a traditional rate case based on the evidence in the record.

The intervenors argue to this court that the Commission did not have authority to enter the Sixth Order. The intervenors contend the Commission entered into an illegal rate deal or bargain with Edison rather than decide the case based on the evidence and the record. The intervenors assert the Commission improperly delegated its ratemaking authority to Edison. (See *Union Electric*, 77 Ill. 2d at 383-84.) According to the intervenors, the Commission, in effect, allowed Edison to set the rates by permitting Edison to choose whether to accept the Sixth Order or have the Commission decide the case on its merits.

In determining whether the Commission had authority to enter the Sixth Order, we must decide whether the Commission actually treated the Sixth Order as a traditional rate case, nontraditional rate case or settlement. A traditional rate case decision involves a one-time increase or decrease in the rates of the utility. The Commission decides, based on the evidence, whether the utility is entitled, at that time, to an increase in rates. The Commission also determines the size of the rate increase, if any, to which the utility is entitled. In order to make this decision, the Commission holds hearings and then issues an order announcing its findings, the basis for its findings and its decision. The utility is free, at anytime thereafter, to file for another rate increase, if it

feels it has some basis for an increase. The Act does not limit the number of times a utility may file for a rate increase within a particular period of time. (See Ill. Rev. Stat. 1987, ch. 111⅔, pars. 9—102, 9—201; *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1953), 414 Ill. 275, 281.) In addition, this court has held that the Act does not permit retroactive ratemaking; that is, the law prohibits refunds when rates are too high and surcharges when rates are too low. *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 207.

A comparison of a traditional rate case with the Sixth Order reveals that the Sixth Order is nontraditional in several respects. First, the Sixth Order sets rates for a five-year period. Second, Edison cannot file for another rate increase for five years. Third, the Sixth Order allows the Commission to give ratepayers retroactive refunds. The parties and the intervenors agree that the Sixth Order is unique; the Commission has never before entered an order with these types of provisions.

Only Edison, Staff, and the IIEC agreed to the Sixth Order. Seven of the intervenors did not agree to the Sixth Order. "Unless precluded by law, disposition may be made of any contested case by *** agreed settlement ***." (Ill. Rev. Stat. 1987, ch. 127, par. 1010(c).) In order for the Commission to dispose of a case by settlement, however, all of the parties and intervenors must agree to the settlement. (See *Mobil Oil Corp. v. Federal Power Comm'n* (1974), 417 U.S. 283, 313, 41 L. Ed. 2d 72, 98, 94 S. Ct. 2328, 2348; see also Ill. Rev. Stat. 1987, ch. 111⅔, par. 11—302 ("The Office [of Public Counsel] shall be permitted to intervene in any Commission proceeding ***. *** The Office shall otherwise be treated as any party to Commission proceedings ***"); Ill. Rev. Stat. 1987, ch. 111⅔, par. 905(2)(d) (The Citizens Utility Board has the power to "intervene as a party *** in any proceeding which affects the interest of

utility consumers"); Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—108.) Consequently, Edison and the Commission could not enter into a settlement alone, without the agreement of the seven intervenors. The Commission realized this and, therefore, stated in the Sixth Order: "[T]he Offer of Settlement is not a settlement agreement and should not be judged by the standards for such an agreement." The Commission went on to assert that the Settlement had to be justified by "traditional rate-making principles" based on "relevant and material evidence." From these statements the Commission leads us to believe it treated the Sixth Order as a traditional rate case, not as a settlement or a nontraditional rate case.

In other places in the Sixth Order, however, the findings and holdings of the Commission reveal that the Commission actually judged the Sixth Order outside the context of a traditional rate case. For example, in finding the units used and useful pursuant to section 9—212 of the Act, the Commission stated:

> "Thus, there is no question that a determination that Byron Unit 2 and Braidwood Unit 1 are used and useful *under the terms of the Offer of Settlement* is *** appropriate ***. The *Commission makes no determination whether Byron Unit 2 and Braidwood Unit 1 would or would not be found to be used and useful under the terms of a traditional rate case* or whether Braidwood Unit 2 would or would not be found to be used and useful under the terms of the Offer of Settlement or the terms of a traditional rate case. Such determinations are beyond the scope of this Order." (Emphasis added.)

At another point in the Sixth Order, while discussing the second-step rate increase, the Commission held:

> "If Edison is willing to accept this [Sixth] Order and a cap of $245 million on the second step rate increase, the Commission will proceed with the next phase of this proceeding. Otherwise, *the Commission will reconsider the*

*opinions and conclusions expressed herein in the context of a traditional rate case."* (Emphasis added.)

Furthermore, in deciding whether a rate increase would be just and reasonable, the Commission stated in the Sixth Order: "The record before the Commission is sufficient to enable it to determine whether Staff's proposed rate increase is just and reasonable *under the terms of the Offer of Settlement."* (Emphasis added.)

The Commission also decided the income tax investigation issue outside the context of a traditional rate case. One of the issues before the Commission concerned an income tax investigation of Edison. Because of a reduction in the Federal corporate income tax rate, the taxes of the utilities decreased. Consequently, an investigation and litigation commenced to determine whether, and to what extent, Edison ratepayers would be entitled to any refunds as a result of the tax decrease. In the Sixth Order, the Commission terminated the tax investigation. The Commission further held:

> "In the event that the second step increase contemplated in this order cannot be implemented under the terms set forth herein, Edison would have the right to reject the Offer of Settlement in its entirety. *** [T]he Commission would then have the right to consider whether a rate reduction and refund of any revenues in excess of what Edison's 1989 revenues would have otherwise been without the first step of the Offer of Settlement would be appropriate. *If such a rate reduction and refund were of an amount that constitutes an effective rate decrease from the rates in effect prior to 1989, the decision to terminate the tax rider investigation should be reconsidered."* (Emphasis added.)

The Commission, in setting the nonnuclear utility plant depreciation rate, stated:

> *"For the purposes of the Offer of Settlement,* Staff recommended a 3.85% rate for non-nuclear depreciation. In its Brief, Edison accepts Staff's rate of 3.85%. The Commis-

sion adopts that rate for purposes of this Order. *If the Offer of Settlement is not implemented, Edison should submit a new study in the form and detail which Staff recommends.*" (Emphasis added.)

In another section of the Sixth Order, the Commission held: "The record in this case establishes that the 32-year life should be used in determining Edison's depreciation rate for nuclear plants *for purposes of the Offer of Settlement.*" (Emphasis added.) The Commission based many of its other holdings and findings in the Sixth Order on the "purposes," "terms," or "context" of the Settlement.

Although the Commission stated the Sixth Order was supported by the evidence under traditional ratemaking principles, the findings and holdings of the Commission in the Sixth Order belie those statements. The Commission asserted in the Sixth Order that it did not consider the Sixth Order a settlement agreement. Our review of the Sixth Order, however, reveals the Commission treated the Sixth Order as a settlement and failed to base its decision "exclusively on the record." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—103.) The excerpts of the Sixth Order just reiterated show that the Commission qualified its decisions on various issues. The Commission admitted it would "reconsider" its conclusions in the Sixth Order "in the context of a traditional rate case," if Edison did not accept the Sixth Order. The Commission made a similar admission in the Fifth Order. The Commission thus implied it could find a different, and possibly lower, set of rates just and reasonable. Moreover, for many issues, the Commission based its decisions on the "purposes," "context," or "terms" of the Settlement.

The Commission admitted the rate increase was "interrelated to other provisions in the Offer of Settlement." The Commission repeatedly emphasized in the Sixth Order that the Settlement was an "integrated

whole." Therefore, Edison had "to express its acceptance of Staff's Offer as a whole" or forgo the Settlement altogether. Thus, the Commission did not base its decision on the record before it. Rather than decide each issue on its merits based on the evidence, the Commission balanced the results of its decisions on various issues between Edison and the ratepayers; this balancing act displays the settlement character of the Sixth Order.

The Sixth Order contained two provisions the Commission did not have authority to unilaterally impose—retroactive refunds and a rate moratorium. To implement the Sixth Order, the Commission had to obtain the agreement of Edison to abide by the Sixth Order. The Commission, however, also had to account for the possibility that Edison would not agree. Thus, the Commission stated that if Edison did not agree to the Sixth Order, the Commission would decide the case in the context of a traditional rate case. By doing this, the Commission acted like any party who offers a settlement to its opponent. In essence, the Commission said to Edison, "Here's our settlement offer. If you don't accept it, we'll have the case judged on its merits." The Commission admitted the Sixth Order had "settlement aspects" to it, but asserted the Sixth Order had to be "evaluated on its merits." We cannot discount those settlement aspects and our review of the Sixth Order discloses the failure of the Commission to evaluate the case on its merits.

Commissioner Stone, who dissented in part and concurred in part in the Sixth Order, accurately analyzed the actions of the Commission:

> "Had I been making this decision within a typical rate case context rather than this multiyear moratorium arrangement, I would have voted against the [Sixth] Order without hesitation for the $235 million Step 1 revenue requirement is supportable only in the context of the five-

year, multiple benefits arrangement. But this 'integrated whole' was presented as an Offer of Settlement, which is a different animal: a hybrid. And therein lie some of the contradictions and shortcomings of the process and the product, as well as some of the benefits. \*\*\*

The Hearing Examiners repeatedly asserted that (1) this proceeding was a unilateral Staff Offer; (2) it was not a settlement proceeding and there were no trade-offs between parties; and (3) the Order is based entirely on traditional rate case evidentiary principles.

Nevertheless, the Order often vacillates between rate case premises and a settlement rationale to reach or justify issue resolutions, picking and choosing among a wide range of evidence, sometimes more on a basis of expediency than of principle and consistency."

Edison denies it entered into a bargain or deal with the Commission, and it also denies the Commission delegated any ratemaking authority to Edison. Edison asserts it did not set out the terms of the Sixth Order. Edison states it could only accept or reject the Sixth Order and such action is allowed under section 10—112 of the Act. Section 10—112, entitled "Service of Order," provides:

"Every order of the Commission shall be served upon every person or corporation to be affected thereby, either by personal delivery of a certified copy thereof, or by mailing in the United States mail a certified copy thereof, in a sealed package with postage prepaid, to the person to be affected thereby or in the case of a corporation, to any officer or agent thereof upon whom a summons of a circuit court may be served in a civil action. \*\*\* Within a time specified in the order of the Commission every person and corporation upon whom it is served must, if so required in the order, notify the Commission in like manner whether the terms of the order are accepted and will be obeyed." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—112.)

Edison contends the Act contemplates acceptance or rejection of an order of the Commission, and thus the

Commission did not delegate any power to, or improperly bargain with, Edison.

We do not agree with the assessment by Edison of section 10—112. Section 10—112 concerns service of a Commission order. Section 10—112 only requires notice by the parties to the Commission of whether the parties will obey the Commission order. Section 10—112 does not give a utility the power to disobey orders of the Commission. (See Ill. Rev. Stat. 1987, ch. 111²/₃, pars. 5—101, 5—201.) Section 10—112 is merely a procedural requirement. Moreover, section 10—112 does not allow the Commission to improperly enter into a settlement with a utility or to set rates not based on the record. Our decision that Edison and the Commission entered into a settlement agreement is not based solely on the Commission's giving Edison discretion to reject the Sixth Order. The Commission also did not base its decision on the evidence.

Edison, the Commission, and the IIEC contend the Commission had authority to *consider* a rejected settlement proposal as a decision on the merits of the case. They cite this language from *Mobil Oil Corp. v. Federal Power Comm'n* (1974), 417 U.S. 283, 312-14, 41 L. Ed. 2d 72, 97-98, 94 S. Ct. 2328, 2348, as support:

"New York contends that the Commission is without power to adopt as a rate order a settlement proposal that lacks unanimous agreement of the parties to the proceeding. That contention has no merit.

The Commission clearly had the power to admit the agreement into the record—indeed, it was obliged to consider it. That it was admitted for the record did not, of course, establish without more the justness and reasonableness of its terms. But the Commission did not treat it as such. As we have noted, the Commission weighed its terms by reference to the entire record ***. We think that the Court of Appeals correctly analyzed the situation and stated the correct legal principles:

'No one seriously doubts the power—indeed, the duty—of FPC to consider the terms of a proposed settlement which fails to receive unanimous support as a decision on the merits. We agree with the DC Circuit that even "assuming that under the Commission's rules [a party's] rejection of the settlement rendered the proposal ineffective *as a settlement*, it could not, and we believe should not, have precluded the Commission from considering the proposal *on its merits." Michigan Consolidated Gas Co. v. FPC* (1960), 108 US App DC 409, 283 F2d 204, 224.

As it should FPC is employing its settlement power under the APA, 5 USCA §554(c), and its own rules 18 CFR §1.18(a), to further the resolution of area rate proceedings. If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits*, if FPC makes an independent finding supported by "substantial evidence on the record as a whole" that the proposal will establish "just and reasonable" rates for the area.' 483 F2d at 893. (Emphasis in original.)"

According to Edison, the Commission, and the IIEC, our holding means that the Commission may never even consider a settlement proposal as a decision on the merits unless all of the parties and intervenors agree to it.

We first note that neither the Act nor the IAPA set out the settlement procedures the Commission must undertake. Likewise, Edison, the Commission and the IIEC have not referred us to any Commission rules on the subject. Second, *Mobil* dealt with Federal law and a Federal agency; Federal procedures are not necessarily consistent with Illinois law and procedures.

Nevertheless, our decision is not inconsistent with *Mobil*. *Mobil* provides that if a settlement proposal has *unanimous* support, an agency could adopt it as a settle-

ment agreement. *Mobil* also holds, however, that if such a proposal lacks unanimous support, the agency may adopt it as a resolution on the merits. In other words, if the agency makes an independent finding, supported by substantial evidence in the record as a whole, that the proposal would establish just and reasonable rates, the agency may adopt a settlement proposal which fails to garner unanimous support.

Our decision mirrors this holding. The Commission stated in the Sixth Order that the Sixth Order was an order based on the merits, not a settlement agreement. We hold, however, that the Sixth Order, in reality, reflects a settlement agreement. Consequently, because the Sixth Order did not have unanimous support, it is invalid. We also hold that even if the Sixth Order is not a settlement, but a decision on the merits, it is still invalid because (1) the Commission did not have statutory authority to enter two of the provisions, and (2) the Sixth Order was not independently supported by the evidence in the record.

Absent statutory law to the contrary, we have no quarrel with the Commission's ability to *consider* a settlement proposal not agreed to by all of the parties and the intervenors as a decision on the merits, as long as the provisions of such a proposal are within the Commission's power to impose, the provisions do not violate the Act, and the provisions are independently supported by substantial evidence in the whole record. Such was not the situation in the case at bar.

Edison believes the novel provisions in the Sixth Order benefit ratepayers and put ratepayers in a no-lose situation. This argument by Edison is irrelevant. Regardless of what benefits ratepayers may have derived from the Sixth Order, the Commission may not enter into a settlement with a utility which excludes the inter-

venors in the case, and it may not enter an order not based on the evidence.

The parties and intervenors all characterized the Sixth Order differently. They each referred to the Sixth Order in one or more of the following ways: a traditional rate case, a nontraditional rate case, a rate deal, a rate bargain or a settlement. We conclude the Sixth Order most closely resembles a settlement. We have enumerated the reasons for our conclusion in this opinion. This conclusion, however, is reinforced by the unique position of the Commission in rate cases. We pointed out earlier that the Commission has the power to investigate as well as decide rates. Staff in the case at bar presented its own witnesses at the hearings, and engaged in settlement negotiations with Edison and the intervenors. The Commission, through its Staff, acted as a party in the case. The commissioners, who are a separate part of the Commission, decided and entered the Sixth Order. Staff presented the Settlement and the commissioners approved it, after the commissioners gained the agreement of Edison. After reviewing the peculiar circumstances of the case at bar and the particular provisions of the Sixth Order, we conclude the Sixth Order constitutes a settlement.

Despite statements by the Commission in the Sixth Order to the contrary, we conclude the Commission used a settlement rationale to justify the Sixth Order. The Commission had no authority to impose a settlement not agreed to by all of the parties and the intervenors. Consequently, the Commission improperly entered into a settlement with Edison. Moreover, the Commission did not base its decision in the Sixth Order exclusively on the evidence presented in the record. We will address various provisions in the Sixth Order to further clarify our decision.

## E. Five-Year Period

One of the unique aspects of the Sixth Order is it covers a five-year period. The Act is silent as to whether the Commission may set rates for a specific period of time. As we indicated earlier, however, the Act does not appear to permit that type of limitation inasmuch as a utility may file for a rate increase at any time.

In establishing rates, the Commission considers the revenues and expenses of the utility. To more accurately determine these figures, the Commission established an administrative rule, General Order 210 (83 Ill. Adm. Code §285.150 (1985)). Under General Order 210, the utility must file its rate data in accordance with a proposed one-year test year. This test year may be an historical, current or future year. The test-year rule prevents a utility from mismatching revenues and expenses. The utility cannot use a low revenue figure from one year and a high expense figure from another year to bolster its evidence in support of a rate increase. In turn, the Commission decides what test year would be most appropriate and bases its rate decisions on the test-year data. In the case at bar, Staff and Edison proposed a 1987 test year, which the Commission adopted.

The intervenors contend the Commission violated its own General Order 210 by imposing rates for a five-year period. The intervenors argue that data for a one-year period cannot accurately justify rates for a five-year period. Moreover, the intervenors contend the Commission, by imposing the test-year rule, intended to limit itself to setting rates for only a one-year period. Thus, the Commission, on its own, set the one-year limit, but then violated that limit by setting rates for a five-year period.

The intervenors' argument has merit. The Commission, in the Sixth Order, stated:

"The Commission adopts Staff's 1987 Test Year. However, in reviewing the evidence in light of Staff's proposal, consideration should be given to the fact that adoption of any such proposal will result in rates which will remain in effect for five years. If Staff's proposal for a five-year rate moratorium is not adopted, the adjustment to rate base and operating income recommended by Staff and other parties but not adopted in this Order may be reconsidered."

Although the Commission adopted the 1987 test year, it acknowledged the test year was not adequate to justify an order which would set rates for five years. The Commission said it would reconsider the rates if Edison did not accept the five-year proposal. We should also point out that the Commission did not adopt a new five-year test period or any other new standard. The Commission simply stated it would give "consideration" to the five-year rate moratorium when it set rates.

This conflict between the one-year test year and the five-year order became apparent when the Commission had to determine whether all, part, or none of the units were "used and useful" under section 9–212. Only used and useful units may be included in the rate base of a utility. One of Staff's expert witnesses, Michael Gorman, testified that, based on the 1987 test year, 48% of Byron Unit 2 and 21% of Braidwood Unit 1 were used and useful. Although the Commission reiterated the testimony of the numerous witnesses presented by Staff, the intervenors and Edison on the used and useful issue, the Commission only appeared to take stock in Gorman's analysis. The Commission, however, rejected Gorman's findings, stating:

"The facts of the case now before the Commission are the facts of Staff's Offer of Settlement. Under its Offer of Settlement, Staff no longer submits that Mr. Gorman's methodology is appropriate. Staff presented Mr. Gorman's methodology in the context of a one year rate case

and still argues that it could be appropriate in the context of a one year rate case, depending on the circumstances involved. However, it is Staff's position that Mr. Gorman's methodology is not appropriate in the context of Staff's Offer of Settlement which establishes a five-year rate moratorium. Staff points out that while the Commission has broad discretion to make used and useful determinations, the reasonable exercise of that discretion depends on the circumstances at hand. Staff concludes that it is clearly appropriate under pre-1986 law to find Byron Unit 2 and Braidwood Unit 1 used and useful under the terms of the Offer of Settlement.

\* \* \*

The Commission concurs with Staff that the used and useful disallowances proposed by Mr. Gorman are not appropriate under the terms of the offer of Settlement. While Mr. Gorman's methodology looked only at the 1987 test year, Mr. Gorman testified that Byron Unit 2 and Braidwood Unit 1 are needed to meet demand and provide economic benefits beyond the 1987 test year. Also, it is inherent in Mr. Gorman's methodology that a utility could present a rate case each year to ratebase more of its generating facility as used and useful as demand and economic benefits increase under the application of Mr. Gorman's methodology. Under Staff's Offer of Settlement, the Commission is setting rates for five years. Edison will not be allowed to file for an increase in rates during that period. Under the terms of the Offer of Settlement, it is not appropriate to impose used and useful disallowances based upon a one-year analysis due to the nature of the five-year moratorium."

The Commission then found "within the context of the Offer of Settlement" *all* of Byron Unit 2 and Braidwood Unit 1 were used and useful:

"Thus, there is no question that a determination that Byron Unit 2 and Braidwood Unit 1 are used and useful under the terms of the Offer of Settlement is a determination appropriate under pre-1986 law. The Commission makes no determination whether Byron Unit 2 and Braid-

wood Unit 1 would or would not be found to be used and useful under the terms of a traditional rate case ***."

Thus, the Commission adopted the 1987 test year, but did not use it to decide the used and useful issue.

The Commission discounted Gorman's approach and based its decision to find all of the units used and useful on two circumstances. First, the Sixth Order encompassed a five-year period and Edison could not file for a rate increase during that period. Presumably, if the Commission found only part of the units used and useful, and a larger percentage of the units became used and useful over the next several years, Edison could not include in its rate base that additional percentage until after 1993. Consequently, the Commission found it "inappropriate to impose used and useful disallowances based upon a one-year analysis due to the nature of the five-year moratorium." For this reason, the Commission found that "within the context of the Offer of Settlement" all of the units were used and useful.

Second, the Commission based its decision on its discretion to make used and useful determinations under pre-1986 law. The Commission stated in the Sixth Order that it was "consistent with the Commission's reasonable exercise of discretion under pre-1986 law not to impose used and useful disallowances under the circumstances." Under section 9—215, if the units were already under construction prior to 1986, the effective date of the new Act, any determination of whether the units are used and useful must be made under the law in effect prior to 1986. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—215.) Byron Unit 2 and Braidwood Unit 1 were under construction prior to 1986. The Commission, therefore, correctly determined it had to decide the used and useful issue based on pre-1986 law. Prior to 1986, however, the Act did not define used and useful. After reviewing pre-1986 common law, the Commission found the units used

and useful because the units were "in service, [were] in round-the-clock daily use, [were] base loaded and economically dispatched, and [were] producing substantial fuel savings." Even if the Commission had discretion under pre-1986 law to determine what portion, if any, of the units was used and useful, the Commission still based part of its decision on the five-year scope of the Sixth Order and the rate moratorium.

Moreover, the Commission did not cite the testimony of any witness to support its finding the units 100% used and useful in the first year and throughout the five-year period. Edison presented the testimony of witnesses to support its position that the units were used and useful. The Commission did not state that it based its decision on the testimony presented by Edison. Instead, the Commission only relied on Gorman's testimony, but it then disagreed with his testimony. Thus, the Commission failed to support its decision with any credible evidence; that is, any evidence other than the circumstances of the Settlement and its own discretion.

The Commission also failed to adopt an alternative approach. In other words, the Commission did not want to base its decision on the test year, but it did not articulate a new standard upon which to evaluate the used and useful issue. The Commission simply considered the five-year scope of the Sixth Order and relied on its discretion under pre-1986 law.

Commissioner Stone, who dissented in part from the Sixth Order, asserted that Gorman's methodology was rational and reasonable. Nevertheless, Stone acknowledged the difficulty in predicting whether and to what extent a unit was used and useful over five years based on a one-year standard. Stone, however, pointed out that the Commission failed to "adopt any alternative to the Gorman approach." Stone stated:

"[H]aving rejected Gorman's single test year determination, there were other alternatives available from the record, had the Commission wished to use them. Most notably, Morris Brubaker, on behalf of IIEC, developed the basis for a five-year phase-in of Braidwood 1. ***

To preserve Gorman's approach and apply an appropriate used and useful standard for the five year period of the Offer of Settlement, Gorman's methodology could have been combined with the 2% load growth analysis of Brubaker. Under Brubaker's analysis, Braidwood 1 would become 100% used and useful in the last year of the moratorium. (1988: 21% used and useful, 1989: 40%, 1990: 60%, 1991: 80%, 1992: 100%) Determining in advance to phase in Braidwood 1 over five years in increments when the reserve margin was expected to fall below 20% would have set a standard—and an appropriate one—for used and useful in the context of the Offer of Settlement.

While such an approach could create problems in Step 2, it would have had the advantage of greater intellectual honesty. It—or a variation of it—would have adopted and adhered to an understandable standard, supported in the record. It would also have provided a basis for future Commission decisions.

Here it is well worth quoting Staff's position on page 9 of its Brief on Exceptions to this Order:

'In their briefs, [the State] and BPI *** take exception to the Examiner's resolution of the used and useful issue. Staff agrees with these exceptions to the extent that they argue that an explicit standard should be set forth. There were a number of standards proposed by the various witnesses. Mr. Gorman used a 1 year standard; Mr. Brubaker used a 5 year standard; Mr. Wayland proposed a 10 year standard; and Edison advocated use of an 'economic dispatch' standard. While Staff believes that its one year standard is most appropriate for rate orders which will be in effect for only about a year, longer term standards may be more appropriate for rates which are proposed to be in effect for five years. Thus, ei-

ther Mr. Brubaker's or Mr. Wayland's standard would be appropriate.'

The Order chooses not to apply any transferrable standard in deciding that Byron 2 and Braidwood 1 are used and useful \*\*\*."

Under certain circumstances, the Commission may have authority to establish rates over a five-year period. The Act does not explicitly limit the authority of the Commission in this regard. In addition, the Act permits the Commission to adopt a "rate moderation plan which is designed to diminish the immediate rate impact" of the inclusion of a new facility in the rate base. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—217.) As we indicated earlier, however, the Commission cannot impose a rate moratorium upon a utility during that period without the agreement of the utility.

Nevertheless, we need not decide here whether or under what circumstances the Commission could set long-term rates because circumstances justifying the establishment of rates over a five-year period clearly do not exist in the case at bar. The established past practice of the Commission was to set rates on a year-to-year basis. (See *Commonwealth Edison Co. v. Illinois Commerce Comm'n* (1989), 180 Ill. App. 3d 899, 908 (The accepted practice of the Commission is to set rates through use of a 12-month measuring period).) General Order 210, a rule adopted by the Commission, is an explicit example of this practice. In the case at bar, the Commission adopted a single test year, 1987, as required by General Order 210, but then, when deciding certain issues such as whether the units were used and useful, refused to rely on testimony based on this test year.

The Commission admitted when it adopted the 1987 test year and when it decided the used and useful issue that it had to consider circumstances outside the test-year data; that is, the five-year length of the Sixth Order

and the rate moratorium. The Commission thus appeared to establish a new test-year or test-period standard which would apply to cases where the Commission set rates over more than one year. The Commission, however, never clearly articulated such a standard. The Commission just "considered" these other circumstances.

The Commission may alter or amend its past practice, but it must follow the procedures set forth in its rules and the Act. Section 10—101 of the Act provides: "Any proceeding intended to lead to the establishment of policies, practices, rules or programs applicable to more than one utility may *** be conducted pursuant to *** contested case provisions, provided such choice is clearly indicated at the beginning of such proceeding and subsequently adhered to." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—101.) The Commission could have set a new standard of procedure in the Sixth Order pursuant to section 10—101. The Commission also could have added a new rule, or amended General Order 210, to establish a new test year or test period for cases which would set rates for more than one year.

Instead, the Commission adopted the one-year test-year standard, but used its discretion to consider circumstances outside the test year in deciding particular issues. The Commission had to either abide by the 1987 test-year standard or set an articulable alternative standard which the parties and intervenors could follow and on which the parties and intervenors could present evidence; the Commission did neither. If the Commission set forth a new standard in the Sixth Order, it did not establish exactly what circumstances or evidence would be relevant or admissible under that standard. The confusing standard and procedure used by the Commission left the parties and intervenors unable to discern what evidence to present or how to structure their arguments

and positions on the various issues. The Commission also did not set a clearly identifiable alternative standard on which future cases would be based. For these reasons, the Commission violated its rules and the Act to the prejudice of the intervenors, and therefore committed reversible error. Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(D).

Moreover, the decision of the Commission to find all of the units used and useful was "not supported by substantial evidence based on the entire record of evidence." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(A).) Any order of the Commission must "be based exclusively on the record." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—103.) As Commissioner Stone noted, the Commission had evidence on which to determine the used and useful issue, but the Commission chose to disregard this evidence. The Commission instead improperly relied on the circumstances of the Settlement. Consequently, the Commission committed reversible error. Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(A).

In the Sixth Order, the Commission referred to its "broad jurisdictional authority *** to reach a resolution." The Commission states in its brief that it can deal freely with each situation which comes before it, regardless of how it dealt with the same or a similar situation in the past; that is, it can make decisions on a case-by-case basis. (*Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 513.) Edison contends nothing in the Act requires the Commission to adhere to a test year or precludes the Commission from considering matters outside the test year. Edison argues that in the past the Commission has allowed consideration of evidence outside the test year. Edison asserts that General Order 210 simply informs a utility of what data the utility must file with its rate request. (83 Ill. Adm. Code §285.110 (1985).) General Order 210 does not

bind the Commission to make a decision based solely on this data. (83 Ill. Adm. Code §285.110 (1985).) Edison thus argues the test year is just a starting point and the Commission can still exercise its discretion. Edison also contends the refund mechanism in the Sixth Order will nevertheless protect ratepayers if the rates are too high.

While some of these arguments may be true, the Commission cannot violate the Act or its own rules, both of which we have held the Commission did under the circumstances in the case at bar. We also note that no matter how much discretion the Commission is afforded under the Act, its decisions are entitled to less deference when it drastically departs from past practice. See *Commonwealth Edison*, 180 Ill. App. 3d at 908.

The intervenors cite specific examples of instances where the Commission improperly relied on evidence outside the test year to support its decision for a rate increase. For example, intervenors assert the Commission relied on 1988 data concerning the unseasonably hot summer and corresponding high electric demand. Again, Edison contends the Commission has discretion to consider such evidence. Part of the confusion in this regard stemmed from the failure of the Commission to set forth an identifiable test-year standard. We need not address these specific arguments here because upon remand the Commission will have to establish an appropriate test year or period in accordance with the Act and the rules of the Commission, and then reevaluate the evidence and arguments of the parties and intervenors. Any decision on our part would be premature, as the issue may not recur upon remand.

The IIEC argues that the Sixth Order constitutes a rate moderation plan under section 9—217 of the Act. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—217.) While the purpose of the Sixth Order may be rate moderation, especially inasmuch as three new units are being added at

one time to the rate base of Edison, the Commission cannot impose a rate moderation plan which violates the rules of the Commission or other provisions of the Act. Furthermore, although the phase-in of a single rate increase over a period of years may be considered a rate moderation plan, the Sixth Order is not a phase-in of a rate increase.

Finally, we wish to point out that the act of the Commission in considering terms in the Sixth Order, such as the five-year rate moratorium, as a basis for altering the test-year standard reveals to us again the settlement rationale of the Sixth Order. The Commission realized Edison would be penalized by the moratorium, so to balance that aspect of the order, the Commission gave Edison leeway on the test-year data. We would not so readily come to this conclusion had the Commission set forth a new, articulable test-year standard based on the evidence. The *ad hoc* way in which the Commission used its discretion, however, leads us to conclude the Commission merely balanced the various issues between Edison and the ratepayers in the form of a settlement. We appreciate the effort of the Commission to resolve these rate issues over a five-year period, thus keeping rates constant. Under the circumstances, and for the reasons we have enumerated, however, we cannot approve or affirm the imposition by the Commission of this five-year order.

### F. Retroactive Refunds and Rate Moratorium Provisions

Two provisions of the Sixth Order—the retroactive refund provision and the rate moratorium provision—create another problem. Under the terms of the Sixth Order, Staff will review the revenues of Edison at the end of each of the five years. If the earnings of Edison were excessive in any particular year, the Commission could order a refund in the following year. This court has pre-

viously held that the Act prohibits retroactive refunds. (*Citizens*, 124 Ill. 2d 195.) The Sixth Order also provided that Edison could not file for a rate increase during the five-year period. The Act does not restrict when or how often a utility may file for a rate increase. See Ill. Rev. Stat. 1987, ch. 111⅔, pars. 9—102, 9—201; *Illinois Bell*, 414 Ill. at 281.

The retroactive refund and rate moratorium provisions, therefore, required the approval of Edison before the Commission could enter the Sixth Order. The Commission could enter into an agreement with Edison to impose the provisions, but the Commission could not do so to the exclusion of the other parties in the case, the intervenors. Although these two provisions, on their face, benefit the intervenors, the provisions also contained exceptions and contingencies which may adversely affect the intervenors. Consequently, the intervenors had an interest in and a right to participate in any settlement regarding these provisions. Therefore, we conclude the Commission acted outside its jurisdiction (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(B)) and beyond the scope of its authority (*Hartigan*, 117 Ill. 2d at 142) by imposing the retroactive refund and rate moratorium provisions.

## G. Rate Range Analysis

The determination by the Commission of the amount of the first-step and second-step rate increases was improper. The Commission allegedly examined the costs and revenues of Byron Unit 2 and Braidwood Unit 1. Throughout its 275-page order, the Commission made findings on virtually all of the rate issues raised by the parties and the intervenors. The Commission used its findings to substantiate the $235 million and $245 million rate increases and hold those amounts reasonable.

Despite the findings by the Commission in the Sixth Order, the Commission apparently determined the rates another way. Staff developed a rate range analysis the Commission described in its brief:

"The staff Offer of Settlement provided for the equivalent of a present value (as of July 1, 1988) rate increase of $373.8 million as just and reasonable. ***

The testimony which staff filed demonstrated the range of just and reasonable rates to be considered. *** In the first step of staff's analysis the low end of the range was developed. The low end of the range takes as its starting point the positions which staff developed during the rate case docket *** which are supported by substantial evidence.

The analysis extended staff's rate case positions and the resulting revenue requirements throughout the five-year moratorium period. Adjustments were made in each succeeding year to reflect inflation, an updated used and useful analysis, the inclusion of Braidwood Unit 2, and other adjustments based upon items affected by the passage of time or individual circumstance. The result of this first step was to simulate rate case results over the next five years under the assumption that staff positions as presented in the rate case would be accepted without change ***. ***

* * *

*** [T]he annual results were redefined in present value terms to derive the current value, or 'payment', of the minimum amount within a just and reasonable range. That is, the present value one-time payment resulting from this analysis is the equivalent of rate case results during the moratorium which adopt Staff's positions. This amount was then chosen as the low end of the just and reasonable price range. *** The low end was a present value revenue increase of $95.9 million. ***

In the second step of staff's analysis the high end of the just and reasonable price range was identified. This step identified key issues of staff's case to which was attached an element of risk. Those key issues involve the

treatment of Braidwood 2 and related costs, staff's used and useful analysis, the deferred charges issue *** and staff's recommended phase-in adjustment. ***

\* \* \*

The development of the high-end of staff's range analysis continued with the inclusion of two more items. *First*, staff subtracted a one-time payment to customers of $225 million from the upper end of the dollar range. This was done due to the fact that pursuant to Section G of staff's Offer of Settlement, Edison's income tax investigation would be dismissed. Staff recognized that this action had value to Edison, and staff, therefore, charged Edison for this benefit. ***

*Second*, an item identified as 'other' was added to the upper end of staff's range. This item reflected staff's judgment as to the value of a settlement, the value of a moratorium, increased costs in doing business not anticipated by staff, and recognition that staff positions on the remaining rate case issues (other than the ones mentioned above) might not prevail in whole or in part. ***

\* \* \*

Staff's range was based upon consideration of positions advocated by the parties ***. These positions all have substantial evidentiary and legal support. The Commission, in the exercise of its discretion, could find rates to be just and reasonable at virtually any point within the staff range. ***

Staff selected $373.8 million for two main reasons. *First*, was the belief that it is more appropriate to use the 1% load growth range analysis. ***

*Second*, the schedules used presented two different methodologies for resolving the issues and deriving a $373.8 million revenue requirement. Schedules 2.6 to 2.8 *** project out the resolution of the issues over the full five-year period of the Proposal in order to derive a $373.8 million present value revenue requirement. Schedule 2.9 *** reflects the resolution of the issues on a 1987 test year basis so as to derive a $373.8 million revenue requirement."

Staff determined the low end of the rate range; that is, what rates would be if it won on all of the rate issues. Staff next determined the high end of the range; in other words, what rates would be if Edison won on some or all of the rate issues. Staff then chose the midpoint of the range. That midpoint equalled a $373.8 million present value increase in rates. Staff translated that $373.8 million into a $235 million increase in 1989 and a $245 million increase in 1990. In the Sixth Order, the Commission acknowledged that the two rate increases equalled a $373.8 million present value rate increase. Romero and Stone, in their dissents, also referred to the $373.8 million present value rate increase reflected in the Sixth Order.

The State points out, however, that the Commission explicitly rejected the rate range analysis in the Sixth Order. The Commission, in the Sixth Order, stated:

> "The Commission remains free under the Offer of Settlement to exercise all of its powers under the Act. Its resolution does not depend on the analyses of rate ranges presented by Staff and other parties. The negotiating process and range analysis preceding Staff's Offer of Settlement are not at issue. Rather, the consideration of the Offer of Settlement depends on the relevant and material evidence relating to traditional ratemaking principles."

Despite this statement, the Commission did not base its rate decision on the evidence. The Commission, in effect, conceded this point by explaining the rate range analysis in its brief; thus, it favored the analysis. The Commission made its decision backwards: it chose a rate increase and then relied on the evidence which substantiated the rate it decided upon. The Commission did not determine the two rate increases independently based on the evidence. The attempt by the Commission to justify each provision in the Sixth Order separately fell short of

covering the rate range analysis on which the Commission relied.

The rate range analysis included consideration of "the value of a settlement, the value of a moratorium, increased costs in doing business not anticipated by staff, and recognition that staff positions on the remaining rate case issues *** might not prevail," according to the Commission in its brief. Staff arbitrarily selected the midpoint of the rate range and made arbitrary assumptions on the success of the various positions of the parties and the intervenors. Such considerations clearly are not findings based on the record. *Hartigan*, 117 Ill. 2d at 145.

The rate range analysis also certainly elucidates the settlement aspects of the Sixth Order. The rate range analysis balances the value of the various issues between Edison and the ratepayers, which is exactly what a settlement aims to achieve. Therefore, we conclude the findings of the Commission concerning the $235 million and $245 million rate increases were not supported by substantial evidence based on the record. Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(A).

### H. Second-Step Rate Increase

We analyze next the propriety of the second-step rate increase. Several problems exist with the contingencies attached to the second-step rate increase. The first problem concerns the "minimum" rate base values of Byron Unit 2 and Braidwood Unit 1. The Commission, in the Sixth Order, found what it called the "minimum" rate base values of the two units. The Commission found these values reasonable. The Commission, however, also held that it would not make a determination of whether any remaining costs of the two units were reasonable until after the Braidwood Unit 2 audit and the 1989 hearings. The Commission held that "the rate base val-

ues established in this Order are minimum values rather than a final determination of the reasonable costs of the two units." The Commission pointed out that under section 9—213 it may include reasonable costs in the rate base of a utility. The Commission found certain minimum costs of the two units reasonable and thus included those costs in the rate base. The Commission, however, left unanswered the question of whether additional costs were reasonable. The Commission asserted that it would determine the reasonableness of any additional costs after the 1989 hearings. In 1989, those additional costs found reasonable would be included in the rate base at that time. The Commission stated that during the 1989 hearings Edison could present evidence to establish whether the "final" rate base values of the units were greater than the minimum values found reasonable by the Commission.

The Commission explained in the Sixth Order:

"During the hearings just completed, Edison presented testimony addressing issues which was intended to show that the rate base value of Byron Unit 2 and Braidwood Unit 1 was greater than the minimum rate base level established herein. Other parties likewise presented evidence intended to show that the value of those two units was lower than that found by the auditors. In this Order, the Commission has resolved the issues relating to whether the value of Byron Unit 2 and Braidwood Unit 1 was less than that found by the auditors. No resolution has been made as to whether the value of those plants should be set at a higher value; nor was such a determination necessary for purposes of the first step.

\*\*\* In view of the fact that we have not determined this matter, and because Staff and/or Intervenors should be given an opportunity to rebut this testimony, the second step of these proceedings should permit the presentation of such rebuttal evidence and appropriate responsive evidence."

Edison receives an additional opportunity to prove larger rate base values. The intervenors, however, do not receive an additional opportunity to prove lower rate base values; they can only present evidence against higher rate base values.

Commissioner Stone pointed out in her dissent that this decision of the Commission created an inherent unfairness in the Sixth Order:

> "In the course of the first phase audit proceedings last fall, Intervenors were placed under unusually severe time constraints to both prepare and present their case for costs *lower* than those auditors had found reasonable. Meanwhile, [Edison] has had many months to develop its case to justify costs *above* those found reasonable by the auditors. According to the Order, [Edison] may prove up the final full rate base values for Byron 2 and Braidwood 1 during Step 2 proceedings. Intervenors, on the other hand, may present evidence only against *increasing* the rate base value; they are precluded from offering new evidence to *lower* the 'minimum rate base value' ***. Thus, [Edison] can move into the five-year moratorium with the assurance that this Commission has used a 'one-way elevator' to set a 'floor' for Byron 2 and Braidwood 1 rate base values." (Emphasis in original.)

The rate base values of the two units, therefore, can only increase after the 1989 hearings.

Edison argues the intervenors can present evidence during the 1989 hearings to establish rate base values less than the minimum values found by the Commission. In the Sixth Order, the Commission held: "All matters resolved in the first phase, except as noted herein, including, but not limited to, the operating income and minimum rate base (without PVRR) necessary to find an increase in revenues of $270,685,000, should be considered final and appealable and no additional evidence should be accepted in these matters." Edison points out the Commission changed this language in its "Second

Order Amending Sixth Interim Order" (Second Amending Order). In the Second Amending Order, the Commission changed the sentence as follows: "All matters resolved in the first phase, except as noted herein, including, but not limited to, the operating income and minimum rate base (without PVRR) necessary to find an increase in revenues of $270,685,000, should be considered final and appealable. Except as otherwise noted herein, no additional evidence should be accepted on nonaudit issues."

We do not agree with the interpretation by Edison of this change in the Sixth Order. The Commission did not change the part of the Sixth Order we quoted earlier regarding the minimum rate base values of the units and the 1989 hearings. In that quoted portion of the Sixth Order, the Commission clearly set forth the evidence Edison and the intervenors could present during the 1989 hearings on the rate base values of the units. The change to which Edison refers does not alter this part of the Sixth Order. Moreover, the statement in the Second Amending Order merely provides that the Commission would not accept additional evidence on nonaudit issues; this does not mean the Commission would accept all evidence on all audit issues.

Edison received more time to prove its position, but the intervenors did not. This action by the Commission skirts the edge of a due process violation. Because we are reversing the Sixth Order for other reasons, however, we need not decide whether this provision actually violates due process.

The most disturbing aspect of the minimum rate base value issue is not its unfairness to the intervenors. Instead, we are concerned with the way the Commission shifted the evidence and issues between the two rate increases. The Commission allowed the parties and intervenors to present additional evidence of the final rate

base values of the units during the 1989 hearings on the $245 million rate increase. The Sixth Order also provided that any revenues in excess of $235 million found just and reasonable could be used to support the $245 million rate increase. The Commission, however, had the audits and other evidence relating to the value of Byron Unit 2 and Braidwood Unit 1 before it in the 1988 hearings. The Commission should have decided, based on the evidence, the reasonable rate base value of those two units. This commingling of evidence on two separate rate increases shows, again, that the Commission analyzed the Sixth Order as an "integrated whole." The Commission viewed the Sixth Order as a single rate increase, and it shifted the evidence between two rate increases to balance the results of various issues between Edison and the ratepayers. Thus, the Sixth Order was not based exclusively on the record, but was more akin to a settlement.

The second problem with the second-step rate increase concerns the $245 million cap. The Commission admitted in the Sixth Order it could not determine the reasonableness of the $245 million increase until the completion of the Braidwood Unit 2 audit. Nevertheless, the Commission presumed the $245 million increase was reasonable. The Commission used $245 million as a benchmark.

The Commission made provisions in the Sixth Order concerning what it would do if the evidence from the 1989 hearings revealed that a "reasonable" amount was greater or less than $245 million; these provisions are revealing. If the evidence discloses a reasonable rate increase should be greater than $245 million, the additional costs could be used to justify a rate increase after the five-year period, but those costs could not be used to increase rates during the five-year period. Edison agreed to this cap. The cap benefits ratepayers during the five-

year period, if the evidence proves the increase should have been larger than $245 million. Nevertheless, the Commission determined, before any hearings and before the presentation of all the evidence, that a reasonable rate increase was no more than $245 million.

In addition, if the evidence during the 1989 hearings shows the rate increase should be less than $245 million, Edison has the right to withdraw from the Sixth Order altogether. If Edison withdraws, the Commission reserved the right to "consider" whether the first-step rate increase should be reduced and whether the rate-payers should receive a refund of the first-step increase.

Commissioner Romero, in his dissent, accurately raised the crucial issue:

> "A problem *** is the Commission's ability to arrive at the $245 million step two increase. Were it not for the $245 million cap which the Commission added to the original proposed order, this would have been the 'Achilles heel' of the Commission's Order. *It is inconceivable that the Commission would allow an as-yet undetermined rate increase to take effect.* At the very least, the cap establishes the upper limit. *But the cap simply begs the question of whether the Commission, let alone Edison, will accept an amount lower than $245 million, should that be what the evidence shows or will the Commission find sufficient benefits in the Offer of Settlement to justify the $245 million.*" (Emphasis added.)

The Commission, without an evidentiary basis, set $245 million as a "reasonable" rate increase for 1990. Considering the enthusiasm of the Commission for the Settlement, we doubt the Commission would find an amount less than $245 million reasonable, thereby risking the withdrawal of Edison from the Sixth Order. Nevertheless, the Commission had no authority under the Act to establish a rate increase before it examined all of the evidence, including the audit of Braidwood Unit 2,

and determined whether the increase was reasonable. Ill. Rev. Stat. 1987, ch. 111²/₃, pars. 9—213, 9—101.

We should also note the use by the Commission of the rate range analysis helps explain its decision to put a cap on the $245 million, second-step rate increase. The Commission had already decided to adopt a total present value rate increase of $373.8 million during the five-year period. Therefore, because the Commission raised rates by $235 million during 1989, it could not raise rates by more than $245 million in 1990. This is, once again, another example of the effort of the Commission to approve the Settlement, rather than decide the case on the evidence.

### III. Conclusion

We, therefore, hold that the Sixth Order reflects an illegal settlement between the Commission and Edison. The Commission went beyond the scope of its authority (*Hartigan*, 117 Ill. 2d at 142; Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(iv)(B)) by entering the Sixth Order without the agreement of the intervenors. In addition, the manner in which the Commission decided the Sixth Order violated the Act to the prejudice of the intervenors. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(iv)(D).) We also hold that the Sixth Order was not "supported by substantial evidence based on the entire record." (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(iv)(A).) Moreover, the Sixth Order violated the Act. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(iv)(C).) For these reasons, we reverse the Sixth Order and remand this cause to the Commission to enter an order consistent with its rules, the Act, and this opinion. Upon remand, the Commission may require the parties and intervenors to present further evidence and may conduct additional hearings, if necessary, to make a proper determination. *Hartigan*, 117 Ill. 2d at 136.

The parties raise innumerable other issues. Many of the decisions of the Commission on various issues in the Sixth Order depended on terms and provisions of the Settlement which we have overturned. Therefore, upon remand the Commission will have to reconsider the entire rate decision. Consequently, the Commission may alter its decision on many of the issues raised by the parties and intervenors. Thus, we need not decide the merits of those issues, as those issues may not recur or arise after remand.

## IV. Refunds

Because we are reversing the Commission's Sixth Order, we must lastly address Edison's obligation, if any, to provide refunds to ratepayers. The Commission entered its Sixth Order on December 30, 1988, and the rate increase provided for in the Sixth Order took effect on January 1, 1989. The intervenors' requests for a stay of the rate increase pending appeal were denied by the courts. During, and as a result of, the litigation over the stay, to which Edison objected, Edison agreed to the following amendment to the Sixth Order:

> "In the event a final, non-appealable order is entered *** finding that the Illinois Commerce Commission lacked jurisdiction to enter the Sixth Interim Order ***, Edison will refund to its ratepayers the full amount of the rate increase authorized by the Sixth Interim Order ***, with interest at the legal rate."

In fact, the appellate courts, in denying the stays, relied in part on Edison's pledge to refund the full amount of the rate increase if the Sixth Order was subsequently reversed. We note that we have reversed the Commission's Sixth Order on both jurisdictional and nonjurisdictional grounds.

Edison does not deny it agreed to the amendment. Edison, however, disagrees with the jurisdictional basis

of our decision. The intervenors, on the other hand, want Edison to comply with the amendment.

We first point out that the amendment apparently alters Edison's refund obligation under common law. If a Commission order which approves a rate increase is subsequently reversed by a court, and the rate increase was not stayed, the ratepayers are not entitled to any refund for excess charges collected between the effective date of the Commission's order and the date of the court's decision. (*Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90.) Moreover, upon the court's reversal of the rates, the utility can continue to charge the rates approved by the Commission. (*Hartigan*, 117 Ill. 2d at 148.) "The utility, however, is subject to ratepayers' claims for reparations for excessive rates collected from the time of [the] court's reversal through the time new rates are approved by the Commission." (*Hartigan*, 117 Ill. 2d at 148.) Edison claims the *Independent Voters* and *Hartigan* refund procedures should apply here.

Apparently, no dispute exists regarding the interpretation of the amendment. The question is whether our decision triggers application of the amendment; that is, whether our decision correctly reverses the Sixth Order on jurisdictional grounds. Based on section 10—201(e)(iv)(B) of the Act and *Hartigan*, we have held that the Commission acted outside its jurisdiction and beyond the scope of its authority by imposing the retroactive refund provision and the rate moratorium provision, and by entering the Sixth Order as a settlement without the agreement of the intervenors. Section 10—201(e)(iv)(B) of the Act provides that a reviewing court can reverse a Commission decision if the "decision is without the jurisdiction of the Commission." Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(B).

Edison argues that the Commission did not lack jurisdiction. Edison points out that the Commission had proper jurisdiction over all of the parties and intervenors. Moreover, the Commission had proper subject matter jurisdiction because the Commission had authority to establish the rates of a public utility. Edison contends the Commission may have *erroneously exercised* its jurisdiction by acting outside the scope of its authority, but the Commission clearly had proper jurisdiction in the case.

We do not agree with Edison's contention. An administrative agency is different from a court because an agency only has the authorization given to it by the legislature through the statutes. Consequently, to the extent an agency acts outside its statutory authority, it acts without jurisdiction. (*City of Chicago v. Fair Employment Practices Comm'n* (1976), 65 Ill. 2d 108, 112-13.) "The term 'jurisdiction,' while not strictly applicable to an administrative body, may be employed to designate the authority of the administrative body to act \*\*\*." (*Newkirk v. Bigard* (1985), 109 Ill. 2d 28, 36.) Thus, in administrative law, the term "jurisdiction" has three aspects: (1) personal jurisdiction—the agency's authority over the parties and intervenors involved in the proceedings, (2) subject matter jurisdiction—the agency's power "to hear and determine causes of the general class of cases to which the particular case belongs" (*Newkirk*, 109 Ill. 2d at 36), and (3) an agency's scope of authority under the statutes. As this court stated in *Chicago*:

"We believe the *jurisdictional rule* applicable to the Commission is analogous to that governing the courts of limited jurisdiction and powers formerly existing in our pre-1964 judicial system. In the context of cases involving the validity of orders or judgments of those courts, this court has said: 'A judgment, order or decree entered by a court which lacks jurisdiction of the parties or of the sub-

ject matter, *or which lacks the inherent power to make or enter the particular order involved,* is void, and may be attacked at any time or in any court, either directly or collaterally.' (Emphasis added.) *Barnard v. Michael* (1945), 392 Ill. 130, 135. [Citations.]

, Since the Commission is a statutory creature, its powers are dependent thereon, and it must find within the statute the authority which it claims. [Citations.] Such agencies have no general or common law powers. It is apparent, therefore, that the Commission was powerless to award attorney fees \*\*\* unless statutory authority to do so exists. *Absent such authorization, the Commission exceeded its jurisdiction* with a void order." (Emphasis added.) (*Chicago*, 65 Ill. 2d at 112-13.)

See *Newkirk*, 109 Ill. 2d at 36-37.

Edison points to *Chicago* for proof that jurisdiction—both person and subject matter—is different from an agency's statutory power to act. Therefore, an agency's statutory power to act cannot be treated as, or called, its jurisdiction. We disagree. A decision by an agency which lacks the statutory power to enter the decision is treated the same as a decision by an agency which lacks personal or subject matter jurisdiction—the decisions are void. Moreover, "jurisdiction" and "authority" have been used interchangeably in certain administrative law contexts. As stated in *Newkirk*, "[t]he term 'jurisdiction' \*\*\* may be employed to designate the authority of the administrative body to act." *Newkirk*, 109 Ill. 2d at 36; see *Chicago*, 65 Ill. 2d at 113 ("Absent such [statutory] authorization, the Commission exceeded its jurisdiction with a void order").

We acknowledge that, theoretically, anytime an agency makes an erroneous decision, it acts without statutory authority because the legislature and the statutes do not give an agency the power to make erroneous decisions. (See *Newkirk*, 109 Ill. 2d at 39 ("A party could merely point to any provision of a statute which was not

complied with and claim that the agency did not have authority to act unless the provision was complied with").) We are confident, however, that a reviewing court can make the appropriate distinction between an erroneous decision and one which lacks statutory authority. See *Newkirk*, 109 Ill. 2d at 37, 39.

In the case at bar, we have held that the Commission acted outside its jurisdiction and beyond the scope of its authority by imposing the retroactive refund and the rate moratorium provisions, and by entering into a settlement (the Sixth Order) without the agreement of the intervenors. As we indicated, the Act does not permit the Commission to undertake any of those three acts. Consequently, the Commission did not merely make an erroneous decision, it acted without any statutory authority and, therefore, outside its jurisdiction.

Edison contends that only if the *entire* Sixth Order was reversed on jurisdictional grounds does the amendment take effect. Edison asserts that we only invalidated the retroactive refund and rate moratorium provisions on jurisdictional grounds and thus the amendment was not triggered. On the contrary, we have held that all of the provisions in the Sixth Order which were part of the five-year plan reflected a settlement between the Commission and Edison which the Commission had no authority to enter into. Thus, we have invalidated the entire settlement proposal, incorporated in the Sixth Order, on jurisdictional grounds. In addition, the retroactive refund and rate moratorium provisions were lynchpin provisions in the Sixth Order. When we invalidated those two provisions, the other provisions involved in settlement fell.

Edison argues that if the Sixth Order is void, then its tariffs requesting a $1.414 billion rate increase are still in effect. Edison points out that a provision in the Sixth Order canceled the $1.414 billion tariffs, and another

provision in the Sixth Order required Edison to file tariffs in accordance with the terms and conditions of the Sixth Order. Edison properly filed the new tariffs. Because the entire Sixth Order is void, Edison contends that the provision canceling the original tariffs is also void; thus, those tariffs are, and always have been, in effect. Consequently, Edison asserts that the higher rates should have been in effect after the Commission entered the void Sixth Order, and the ratepayers are thus not entitled to any refunds.

Edison relies on section 9—201(b) of the Act and *Central Illinois Public Service Co. v. Illinois Commerce Comm'n* (1955), 5 Ill. 2d 195. Under section 9—201(b), if the Commission enters upon a hearing concerning the propriety of a utility's proposed tariffs, the utility's proposed tariffs may be suspended for up to a period of 11 months after the filing of the tariffs. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—201(b).) Pursuant to *Central Illinois*, if the suspension period expires before the Commission concludes its proceedings, the utility may begin collecting charges under the proposed tariffs, but the new rates remain subject to cancellation by the Commission's final order in the proceedings. (*Central Illinois,* 5 Ill. 2d at 206.) Edison argues that because the Sixth Order was void, Edison's original tariffs were not canceled and hence went into effect upon the expiration of the suspension period on May 10, 1989.

We do not accept Edison's reasoning in this regard; to do so would lead to an incongruous result. In canceling the $1.414 billion rate increase, the Commission found in the Sixth Order that those rates "would produce a rate of return in excess of a return that is fair and reasonable." If Edison's interpretation is correct, then our reversal of the Commission's *lower* rate increase would result in a *higher* rate increase, which the Commission found unreasonable. Moreover, if Edison's

argument is correct, then Edison never conceded any-thing when it agreed to the amendment. Edison agreed that if the Sixth Order was reversed on jurisdictional grounds, it would refund the rate increase. We empha-size that Edison voluntarily made this agreement, and did so primarily to avoid a stay of the rate increase pending appeal. Edison voluntarily altered its refund ob-ligation under common law. If Edison thought the $1.414 billion tariffs would be reactivated by our rever-sal of the Sixth Order, then Edison knew it would come out on the plus side regardless of the result of this court's decision.

The purpose of the limit on the suspension period provided for in section 9—201(b) is to prevent the Com-mission from delaying indefinitely its decision on a utili-ty's request for a rate increase. In the case at bar, the Commission acted within the permitted suspension per-iod; it canceled Edison's proposed tariffs, finding them unreasonable, and it established a different rate in-crease. Because the Commission so acted, we cannot say the purpose of section 9—201(b) was violated.

Furthermore, it is our conclusion that the cancellation of the proposed $1.414 billion tariffs is not void, but re-mains in effect. Our reversal of the Sixth Order concerns all aspects of the order which involved the five-year rate agreement. In other words, the Commission's action can-celing Edison's proposed tariffs is separate from the Commission's action in setting new rates and in deciding the other issues related to the five-year plan.

As a result, upon issuance of our mandate, Edison must comply with the refund amendment to the Sixth Order. In addition, upon remand, the Commission, pursu-ant to section 10—201(e)(vi) of the Act (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(vi)), will have up to 11 months within which to determine the rate increase, if any, to which Edison is entitled, as well as to determine

all of the other related issues raised before it in these proceedings.

For the foregoing reasons, we reverse the decision of the Commission. We remand this cause to the Commission to enter an order consistent with this opinion.

*Reversed and remanded.*